Case number 13-5358, Combat Veterans for Congress Political Action Committee et al. Appellants v. Federal Election Commission. Mr. Kamenar for the appellants, Mr. Summers for the appellee. Good morning, your honor. Paul Kamenar for the appellants. I'd like to reserve two minutes for rebuttal. I'd like to focus on two issues before the court this morning. One, that the district court erred by not even considering our challenge to the FEC voting procedures, which unlike any other multi-member agency in this town, regards the silence and failure to express his or her position to begin an enforcement action as casting a statutorily required, quote, affirmative vote, end quote. Because we didn't raise it at the agency level and that the defective ballots were not part of the administrative record which was supplied by the FEC. Secondly, the district court also mistakenly concluded that the commissioners considered the personal liability of the treasurer for failing to file timely reports due to his willful misconduct and had offered reasonable ground for not pursuing him when in fact those were post hoc rationalizations made by the FEC attorneys, not the commissioners. Turning to the first issue, while it's the general rule of administrative law that a review in court is precluded from considering matters not raised at the agency level, that general rule does not apply here for one obvious reason. We had no idea what the ballots were cast until after the enforcement action was completed and after we filed suit in the district court seeking review of that action and forced the FEC to discourage those ballots. The FEC simply misled the parties in the lower court below by submitting a blank ballot in the administrative record along with a misleading certification by the secretary of the commission that said that the commission, quote, decided by a vote of six to zero and that all commissioners, quote, voted affirmatively for the decision. But once we got the ballots, we found that with respect to all the three late filings, there were never more than three ballots cast at the reason to believe stage. In short, there never was a sufficient four affirmative votes to begin the action required by the statute. Weren't you on constructive notice, though? Didn't that Directive 52 set out the streamlined no objection procedure? No, Your Honor. That Directive 52 was buried in the FEC website under administrative law constructive notices when something is put in the Federal Register. The FEC says that, oh, the rules of procedure is in the Federal Register, and this was an amendment to that, but this never appeared in the Federal Register. Plus, in any event, even if we had knowledge of what this secret policy was that was improperly promulgated under the Sunshine Act, even if we knew that, we still had no idea that they were not going to submit the six affirmative votes. So if they had done that, we probably would have said at least they're trying to comply with the statute by actually casting the ballots. But here, total silence by the commissioners is regarded by them as casting an affirmative vote to begin an enforcement action that is just flatly contrary to the statute. So if we assume that you've preserved the issue on the merits of the affirmative vote requirement, it's your position that the statute is unambiguously clear in requiring what the briefing refers to as a tally vote as distinct from a no objection vote? Is that right? Well, Your Honor, the statute is clear that four affirmative votes are required. There's nothing ambiguous about those three words. The ambiguity that I see is that an affirmative vote could either mean a tally vote, that you've marked down your vote on a sheet, but it also can mean a vote yes as opposed to a vote no. And that construction seems to me or that understanding of the language seems to me plausible given that it's kind of combining, saying even if you had a low quorum, a majority isn't enough. What we need is four yes votes to go forward because of the bipartisan nature of this commission. So the unique wording, I guess, could mean either what you say, tally vote, or yes vote. Well, Your Honor, just to make this clear, the Directive 52 makes a distinction between a no objection vote and a tally vote. A tally vote is where they actually check a box, and that was done at the final determination stage, although that was defective in itself for other reasons. The no objection vote is if they don't file anything. Right. If the six commissioners don't do anything, that cannot possibly comply with the statute of four affirmative votes. Well, what I'm saying is that if the agency comes up with a process that they deem to be adequate for determining who says yes and who says no, and their way of doing that is to say we have a no objection procedure. If you don't say no within 24 hours of circulating this, that's deemed under our procedures to be a yes, and that could be fulfilling the affirmative vote requirement. Your Honor, I think that that is too much credence on what that silence means. Four affirmative votes, if you look at in our briefs in terms of what Black Laws Dictionary defines as a vote, that's where you're making an expression of your views on a particular matter. Not voting at all counts as an abstention. No, no, that's not right. If you say at a wedding, speak now or forever hold your peace, and you don't speak, you're understood under the rules of that game to have no objection, to acquiesce in what's going forward. And so they've set it up as a process. This is how on these matters you express a yes vote. And we obviously have to give a tremendous amount of deference to the internal logistics of an agency as long as the statute permits it. And so that's my question, is what forecloses that as a potential ambiguity? Your Honor, I think that this is under just Chevron Step 1, the four affirmative votes is clear in the statute. They even have that in their own regulation under the CFR that you have the four affirmative votes. It's only when they have this secret Directive 52 that's buried in their website that they say, oh, by the way, we're going to say that. If you don't say anything, that presumes that they even got the notice. Well, you're begging the question because you say, oh, they have it in the regulation. They just have the same language, affirmative vote. And my question is, how do we know that the only permissible meaning of that term is tally vote affirmative as distinct from yes expressed through the process they set up? Well, because with a no objection vote, you don't know whether the commissioner either, A, got the information from the staff recommendation, B, whether they even read it, and C, whether they made an expression. I simply we maintain that there can be no way that when a statute says you have to have four affirmative votes, that this can go out and if 24 hours ticks off the clock and we didn't hear anything, oh, you voted affirmatively for this decision. It may be something different if you want to keep the status quo, like this court itself, when you're doing circulating for re-hearing en banc. If there's no affirmative votes to hear the re-hearing en banc, there's no majority. Therefore, the status quo remains. But, Mr. Kaminer, we have, I mean, we apply time and time again a presumption of regularity that agencies can function. And, you know, presumably if they believe there's a need for safeguards to determine that people received the circulations that are made internally and that they've had a chance to address those circulations, they would put those into place. But you don't have any evidence that they haven't, do you? That there are people whose votes are being recorded as agreed where they don't, in fact, see the document? Your Honor, there is a presumption of regularity. But here we think we've rebutted that presumption by actually showing that there was no sufficiently four votes cast. There were some that were said that they did not object. There were some that were signed by another staffer. And there again, the director says that has to be required by their own direction by the agency to the staffer. And they won't give us that information to verify that. But the record doesn't show that there were the sufficient votes at the reason to believe stage. Sufficient tally votes, but you're really, again, begging the question that I'm asking, which is do you have reason to believe that someone who did not mark a ballot didn't also, didn't nonetheless see it and think, oh, I agree with that. Therefore, under FEC process, if I let it go, that records my affirmative vote. We don't have the record on that, right? Right. Let me ask you just one more question, which is about the, you know, you mentioned that this is at the reason to believe stage. And here the violation didn't actually require investigation or subpoena powers or, you know, it's pretty open and shut once you know someone's filed late. So what's the harm? Like why isn't it harmless error that's cured by the final tally vote on the merits? Right. Well, first of all, there can never be harmless error when the issue goes to the validity of the exercise of an agency's enforcement powers. It's fundamental error. Chamber of Commerce versus NLRB is instructive here where the validity of the vote was in question because of the absence of a quorum. And there the court said the NLRB is a creature of statute. It possesses only that power that has been allocated to it by Congress. And there the court struck down the final rule. With respect to, well, you know, they eventually did get around to a final vote. I refer the court also to Mack Trucks versus EPA in our brief where the court rejected the government's argument that, oh, it's harmless error for not giving notice and comment at the interim final rule because, after all, we provided the notice and comment at the final rule. This court said, otherwise, if we allow that, quote, agencies would have no use for the EPA when promulgating any interim rules, end quote. And we would say here, yes, if this is upheld, the agency doesn't have any reason to comply with the statute that requires formal affirmative votes. Finally, the FEC relies on FEC versus Legitech from this court. And there is instructive as well on our side because there the court held that there was prejudice by the invalid votes, but that prejudice had dissipated when the FEC was reconstituted and had ratified that prior invalid action. Now, the FEC in their brief says, oh, well, the FEC could have ratified this, which is what we claim is an invalid enforcement procedure, but the facts of the matter, they have not to this very day. Why isn't what they did at the final merit stage on the administrative fine, why isn't that ratification? What's, I guess, just in sort of common sense, concrete terms, what's the prejudice that your client suffered? What was imposed on your client, even assuming that the vote was not an affirmative vote at the reason to believe stage? Where's the line? Obviously, the prejudice is that we were forced to engage in an enforcement action that was a valid ob initio. We also had the stigma of having been charged with violating a federal FEC regulation and filing. You can't contest that. You did violate it. I mean, it was late. But that only begins the inquiry, Your Honor. It does not end it, because we had other defenses, such as the best efforts defense, such as that the treasurer is liable for this, even under the FEC's own regulations, and even with respect to the general counsel and their administrative review officers said to the commission, we request that you consider the personal liability of this treasurer. And yet, under these tally votes that came in, where's their reasoning? There was no reasoning why the FEC rejected that kind of enforcement action that would take the burden off of us. The court below said, oh, the commission gave reasonable grounds for that. But there's nothing in the record of what the agency did. That's what the FEC attorneys post hoc rationalized what the agency did. And furthermore, these votes, even at the final stage, again, are defective in the sense that you still need four affirmative votes. But at the final stage, the final determination stage, there were only two votes we claimed that were valid, one that they said they approved the recommendation. There were ones submitted after the ballot deadline, which by their own secret directive 52 says it has to be submitted by the deadline. And there were three others that were signed by another staffer. And the commission's secret directive, well, semi-secret directive says, if you're going to have a staffer sign in your name, you have to give the specific instructions on what they're to do and how to vote. And that has to be kept as a record with the agency, the commissioner. We asked for that information, and the FEC has refused to give us that. So even at the final determination stage, there could be a defective voting procedure there. If we were inclined to remand to the agency, is there anything additional that you think could be beneficial to your claim in terms of things that would go into the administrative record? Well, Your Honor, if you remand either to the district court to consider our argument, which the court obviously should have, or if you vacate to the agency, they would just have to begin the process again. They would have to. They may even decide. What would you want to know that you'd be entitled to know that you don't have? What would I want to know? Well, I would want them to, first of all, proceed under the statute by finding a reason to leave, and secondly, by finding why they did not find the treasurer personally liable. They were requested by their review officer, Office of Administrative Review Officer Dana Brown, to consider this, and yet when the final vote came down, there was nothing there. All it said, by the way, is I approve the recommendation. But what was the recommendation by the staffer? The staffer said, we recommend that you make a finding that there was a violation here and assess the fine. But there really was no order or process by the commission. They never dropped the other shoe and said, we hereby find that you violated the law. All they said is, we don't object to you recommending that we make that statutory decision. So it seems that the commission is basically offloading their responsibilities to their staff, and we think that under those circumstances it demands that the whole administrative proceeding be vacated. All right, you've gone over your time. We'll give you a couple minutes. Thank you. Mr. Summers? Mr. Summers? Can I ask you a question? I don't know that the plaintiff raises this, but do you concede that he could have challenged the vote under this, at the reason-to-believe stage under 11 CFR 111.35, which seems to have only three bases in order to challenge it, that the commission's reason-to-believe finding is based on a factual error, that it improperly calculated the civil money penalty, or that the respondent used the best efforts? I mean, I don't see where he could have made that challenge. Do you concede that he could have? I agree that that's not specified within the categories that you point out. I think it's likely that he could have challenged it then in the sense that it's a basic procedural objection, an objection that the agency had not followed the relevant procedures. So that's really not the argument we're making. So an ultra-large attack, or what? Well, I guess on the merits, it would be the same kind of attack they've made, that the agency failed to follow what the statute and its regulation says is required in order to go forward. So we're not really arguing that, I think, that it would not have been proper to raise it at that time. We are arguing, for a lot of the reasons we've been talking about, that it would not have been a meritorious argument. And I do want to talk about the voting. I wanted to, if I could, first just say that the case really is mainly about these admittedly late campaign finance reports and whether there's any legal excuse for the admittedly late filing of those reports, not all the collateral matters, really, that the appellants have raised. But there's an organic statute that discusses what the power of the commission is. And that organic statute uses the language that, I guess it's what was 437C, subparagraph C, about voting requirements. Congress used the definite article, not the indefinite article, by saying, except that the affirmative vote before members of the commission shall be required to do certain things. Isn't the placement of the definite article, the way that that's raised, unambiguously requiring action as opposed to inaction by at least four commission members? Your Honor, I think the relevant part of the statute, the one we're talking about here, is at 52 U.S.C. 30109A4, which governs the commission's enforcement procedures. And I believe that the language, to the extent that the article is significant, speaks of an affirmative vote of at least four. I believe that is the relevant language. I think the language that Your Honor is pointing to is a general statement of what the commission's powers, as a broad matter, how they are exercised. But the more specific language, I think, in what used to be section 437G, GA1, I believe, it says the affirmative vote before members shall be reported, et cetera, to take any action in accordance with paragraphs 6, 7, 8, or 9 of 437DA. So it's referring down to then what the powers of the commission are. And then when you get to DA and you get to DA9, it says to conduct investigations and hearings expeditiously, et cetera, et cetera. I don't see anything there that talks about the affirmative vote. The affirmative vote requirement, as I see it, comes from what was 437, I guess this was when it was back in Title II as opposed to wherever it is now. That's right, Title 57. It says the affirmative vote. Now, if I'm wrong about that, point me to where in the statute I'm wrong about that. Your Honor, I think it may be stated the two different ways at different points in the statute. But whichever way it's stated, I would add to some of the points that have been made already. Is it? If it's stated at a different point in the statute that's relevant, point that to me now. Yes, Your Honor. Your Honor, I believe in Section 52 U.S.C. 30109A1, if I'm not mistaken, as referred to by the portion of the statute in which Congress created the Administrative Clients Program. Where is that in your addendum or their addendum? Your Honor, I think I'd have to refer to my addendum. Is it not A2? I think it's page 44. Your Honor, I think it's A1 and A2 both. It's at page 44 of our addendum. Between pages 44 and 49, we lay out Section 30109. And I think when Congress created the Administrative Clients Program, that's in Section 30109A4C. And that refers back to the earlier parts of Section A in describing the streamlined process that the agency was to create and did create in order to handle these relatively routine, late filings in a more summary and efficient way. And that was a goal and, I think, an accomplishment of the commission in creating the program. Whichever way, though, whether it's the or an affirmative vote, it is well established, as I think was mentioned earlier, that considerable deference is owed to the agency's interpretation of what the statute means under the Cannes Channel Act and other D.C. Circuit cases. So in this case, the text really should be interpreted in light of the purpose of the Administrative Clients Program, and that was to streamline the enforcement proceedings relevant to relatively routine violations. In this case, we do have a directive, Directive 52, a well-established agency practice that describes how it's handled, and that's well understood by the commissioners who make these decisions. There is a strong presumption of agency regularity under the Mwekma case of this Court and others. And in this case, it is consistent with affirmative to read it as an implied yes. It's an implied indication of yes. But isn't the definition of vote, whether you look at Webster's or Black's Law Dictionary at the time that Congress passed this, it's an expression of will. It's a formal expression of will. That's the common definition of vote. And so what the commission has done and said, our staff is going to express its will, and if you don't say anything, then the staff's expression becomes effective. It becomes self-effectuating. And these cases weren't cited in the brief, but I searched through the U.S. Code and through reporters for cases construing statutes that say, shall be deemed admitted. And courts construe those kinds of provisions as basically something that forces the government actor or some actor to act quickly. If they don't, then whatever action was proposed becomes self-effectuating. So whether you vote or not, whether you intend to support it or not, if you just don't act, it becomes effective. There's no formal expression of will by that decision-maker. So I don't see how that's consistent with the definition of vote. Your Honor, I understand your point. I think it is consistent in this situation, in this particular circumstance, and it may not be in every circumstance. But here, where we have the program that Congress created with the goals that we have, and where it's important to remember the factual determination that's being made here is very straightforward. That's why Congress put this program in place, to find a reason to believe that the law has been violated. I mean, really, there's essentially no dispute that there was reason to believe the law had been violated here. There's no dispute. The reports were filed very late. The fines that were imposed were correctly calculated. And at the reason to believe stage, that's really all the agency has to find, were the reports late. You're defending this reading of affirmative vote only in the context of this streamlined process. But given that that language appears more broadly in the Act, what is to limit the authority of the FEC to institute no-objection voting for much more important functions? I mean, here it seems like the traffic ticket function. But if we affirm your latitude to read it that way for this, why not for much more intrusive and politicized determinations? I think the limitation is exactly what you refer to, Your Honor. It's the fact that the analysis would be very different if it were being interpreted that way in a different context. Do you have a precedent that you would have latitude to interpret the same term, affirmative vote, in two different ways depending on the seriousness of the function? I don't have that precedent before me, Your Honor. It would seem kind of important to your position, because doesn't it assume that? I don't know if it assumes it, Your Honor. But in this particular circumstance, that is our position. I think that every case is different. And we're not arguing that, and I don't think we would argue, that if there was a more, if there was a final determination. This is a basic preliminary determination in a routine matter. So I understand the point, but I think in this case, it is a permissible interpretation of that term. Based on what the different potential meanings of that term, it may not be a reasonable interpretation of that term in other contexts. And indeed, in more consequential final determinations, it may well not be. Why is that? I mean, are you not confident that the no-objection process actually reflects the considered judgments of the commissioners who vote through that process? I'm not sure I understand, Your Honor. In other words, one of the things that Petitioner was raising was the concern that, you know, maybe the commissioners whose votes are recorded as yes votes on some of these matters never saw the papers. They never actually made any decision whatsoever. And I guess I want to know what your response is to that. Is that, in fact, permissible in your view? And do we have any reason to believe, one way or the other, that there are safeguards in place, inventory processes or receipts in place, to determine that they have, in fact, contemplated the questions before them on these affirmative votes? Your Honor, there is an assumption of the regularity of agency processes. This is a well-understood procedure. It is on the website. It's something that's been in place for years. There's many checks in addition because it's merely a preliminary determination. It's not final agency action. Nothing can be done with it. It merely allows this proceeding to go forward. The checks in this case, they've had every kind of opportunity to be heard. Not only they were able to respond after this reason to believe finding, they were able to respond and did respond again prior to the final determination. And then even a third time, when they requested reconsideration, which is not something provided for in the procedure, but which the commission again considered, and there was, again, another 6-0 vote on the final, on the request for reconsideration, all those elements of the procedure provide the checks on any potential problem and issue. There is no evidence of any irregularity here. It's true that because of the well-understood practice, we don't have an indication proof, like a completed ballot. So I understand that concern. But because of all those other checks, because it is a preliminary determination, because the program is so well-understood and is supposed to be a streamlined one, there's really no indication here that there's anything amiss. So I'm still concerned that we have this other provision, the matched provision, 30106C, which also includes a reference to an affirmative vote, and for many other more important, more momentous functions, the functions listed in paragraph 6789 and the like. And you're saying that those could be distinguished, that you could read affirmative vote differently there. What's lost by the agency in reading affirmative vote the way that the petitioners here would read it? If you could get, as a commissioner, a list of these affirmative fines and just have to initial a page, maybe it would be helpful to us to find out what the burden of that would be. How often are these imposed? Are there just thousands of them, or is it hundreds? Is it dozens? How hard would it be to just require an initial, or even a delegated initial, by someone in the commissioner's office? Your Honor, it may well be that that is a procedure that the commission could function with. I think there are not thousands and thousands of these violations every year, but there are a significant number, and the commissioners have many different things they're doing. This was an effort to balance efficiency with fairness, with due process, and we think it does. If the agency has not been – that's one of the issues we've raised. I mean, the agency has not been given a chance to reconsider this. It is possible, if given that chance, that it would make a different decision. Are you asking us for – let's say we were to remand so that you could give us your full judgment on this. It sounds like there was this – I'm not sure why there was so much reluctance to giving the ballots that were requested, but we didn't have a full consideration in the commission. If we were to send it back, is that something that you think would be useful? Can you tell us a little bit about why you think that might be useful? Your Honor, I don't think it's necessary here. I think that in this case, there's been no showing of harm from this, you know, arguable flaw or defect in the process, so I don't think that's necessary in this case. Of course, it may always be useful for an agency to reconsider how it's balanced these different determinations and its procedures. I do – I would say, though, that it was an effort to streamline the process, as Congress intended, an effort because of the awareness that there were safeguards in place, and it's a very simple and straightforward determination at that stage. So that determination was made. Congress has passed several laws where, you know, an agency or some other body takes an action and then it becomes effective after that final agency action, after a certain period of time, if Congress doesn't disapprove the action. Federal sentencing guidelines work that way. There's a sentencing commission. They promulgate guidelines. They go into effect unless Congress acts to change them. Here in the District of Columbia, there's the Home Rule Act that gives the D.C. City Council authority to pass laws in certain areas, but even those laws where they have authority to pass, they don't go into effect until there's this congressional review period expires. In those circumstances where Congress doesn't act and a D.C. law goes into effect, has Congress voted? Your Honor, I think I'd have to look at all the relevant circumstances there, and I'm not sure I know enough to answer just based on what you've said. It would depend on the particular structure of regulation that was in place, and I think it is very context-dependent. What else do you need to know to answer my question? Well, the relevant language that's being applied, all the different policy concerns that go into it, the relevant precedent, I think it's a very complicated analysis, and this is a very isolated question. If the D.C. Council passes a law and a review period comes and goes and Congress doesn't act one way or the other and the law becomes effective, has Congress voted? It's a pretty simple question. It's possible that Congress would have voted if Congress had in place a recognized procedure that said if we do not act within that period, it will be deemed a vote on our behalf. Everyone in Congress knew that, and there was no additional countervailing circumstance or factor that made that a bad idea or, you know, that reduced the risk that that would cause some other harm. And if, as here, it was a preliminary determination, very soon to be followed up with a more formal voting procedure on the same issue, and if all the other factors present in our case were present, then in that case I would say that may well be a vote, yes. So I see my time is up. I did want to make a couple other points. I'd like to ask a member of Congress if they agree with that assessment. Your Honor, they might not. But, again, to be similar to this situation, it would depend on there being a structure in place in which it was stated that their vote would be counted in that way. So maybe they would not agree to that. Why don't you wind it up? Okay. Just a few points quickly. The commission did consider the treasurer's liability. I think that's pretty clear from the record. There was no recommendation from the reviewing officer or the Office of General Counsel that the treasurer, the original treasurer, be pursued. In his personal capacity, that's just not the case. It was merely noted that that was possible. But the recommendation was always not to do that, but instead merely to impose liability on the committee and the office of whoever was currently the treasurer in an official capacity. The Chamber of Commerce case is distinguishable, as we did in our brief, I believe, because in that case it was a final rule. This is merely a preliminary, non-final determination and, again, pursuant to a well-established agency procedure. And finally, the Mack Truck case, that's another very different context, the rulemaking context. This is an administrative fine. There's no lack of process here. There was a full opportunity to be heard multiple times, which appellants took full advantage of. And, again, winding up, there's no reason to think that with all the alleged all the defects that have been alleged that there would be any different result in this case. So any error was harmless error. Remand would be futile. We ask that you affirm the district court's decision. All right. Thank you. Does Mr. Kammerer have any time? Why don't you take two minutes? Okay. I don't need that much time. Thank you, Your Honor. Just to address the whole argument that they're making, that this process is a streamlined process. Congress wanted to streamline it, and that's why we wanted to streamline this process and streamline away the rights of respondents here and violate the statute. This Directive 52 was promulgated in 2008. The Administrative Fines Program was in effect 1999. So the agency almost had a decade of at least attempting to comply with the law by casting affirmative votes. And as Judge Wilkins rightly pointed out, you have to have an expression of what your position is. And Judge Pillard also rightly pointed out that there's no limit to this kind of agency application of your statutory duty. This directive is not in the Federal Register. It's not even in the Rules of Procedure, which I find amiss. Basically, I hide the ball. And in terms of the treasurer's liability, we just heard counsel say, well, actually the record does show that the commission considered it. It's not in the record. All it says is, I approve the recommendation. But the staff person actually requested the commission to consider it, and as we all know from NADER versus FEC, et cetera, you have to have a statement of reason why you're not engaging in this enforcement action. It was simply not there. Finally, the best efforts regulation, we did raise that below, and the record shows that this regulation constricts what kind of arguments we can make as to why we use their best efforts and the treasurer should be the one held liable. In conclusion, Your Honor, we ask this court to reverse the district court judgment and not countenance this clear violation of the statute and that its failure to hold treasurers liable and accountable undermines the integrity of the campaign finance reporting system. And as the chairman of the commission just recently said, quote, only where there are real consequences is there respect for the law. There aren't real consequences now. Well, the consequences was to hold the treasurer who is reckless liable for this and not the innocent committee.
judges: Henderson, Pillard, Wilkins